IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMES F. LOGUE,** | : | Civil No. 1:23-CV-00535 |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | |
| | : | |
| **THE UNIFIED JUDICIAL SYSTEM OF PENNSYLVANIA, by and through its established court, the YORK COUNTY COURT OF COMMON PLEAS, and SETH FORRY, in his official capacity.** | : : : : : : : | |
| | : | |
| **Defendants.** | : | Judge Sylvia H. Rambo |

## M E M O R A N D U M

Before the court is a motion to dismiss the amended complaint for failure to state a claim filed by the Unified Judicial System of Pennsylvania ("UJS"), the York County Court of Common Pleas ("York CCP"), and York CCP Probation Officer Seth Forry ("Forry") in his official capacity.[1] (Doc. 33.) For the reasons set forth below, the motion will be granted.

**I.    BACKGROUND**

This case arises from a dispute involving Plaintiff James F. Logue's ("Logue") participation in York CCP's DUI Treatment Court Program (the "DUI

---

[1] An official capacity suit is "in all respects other than name, to be treated as a suit against the entity." *Ky. v. Graham*, 473 U.S. 159, 166 (1985). Thus, Logue's official capacity suit against Officer Forry is to be treated as against York CCP, who is already a party, and therefore the court will proceed to address the claim as brought against York CCP only.

1

Program"). The following facts taken from the amended complaint and accompanying exhibits are considered true for purposes of evaluating this motion.

Logue alleges that he suffers from alcohol use disorder, which substantially limits one or more of his major life activities. (Doc. 31 ¶ 8.) On May 18, 2020, Logue was pulled over in his motor vehicle and charged with driving under the influence for a second time. (*Id.* ¶ 26.) He was given a SCRAM alcohol monitoring bracelet on May 26, 2020, and in November 2020, through counsel, Logue applied for the DUI Program.[2] (*Id.* ¶¶ 27-28.)

On April 28, 2021, Logue pleaded guilty to the DUI offense. Concurrent with his plea, he was accepted into the DUI Program and released from the SCRAM monitor. (*Id.* ¶ 29.) Logue's participation in the DUI Program included ninety days of house arrest, weekly court reporting sessions, random drug and alcohol screenings, outpatient group therapy, Alcoholics Anonymous meetings, course work, and community service. (*Id.* ¶ 31.)

In July 2022, Logue was notified that he was scheduled to graduate from the DUI Program on August 23, 2022. (*Id.* ¶ 34.) However, on August 11, 2022, he

---

[2] The DUI Program, run by York CCP, maintained a DUI Wellness Court Policy and Manual (the "Manual"). (*Id.* ¶ 15.) The Manual explained, *inter alia*, "[t]reatment may include, but is not limited to: outpatient, intensive outpatient, outpatient partial hospitalization, residential partial hospitalization, halfway house, and inpatient (short, moderate, or long term)" and "DUI Treatment court does accept and will treat participants assessed with dual diagnosis and psychiatric disorders." (*Id.* ¶¶ 17-18.)

2

appeared for a random urine screening, which came back positive for alcohol. (*Id.* ¶¶ 38-39.) Logue denied using alcohol and explained that he had instead used a throat spray that listed alcohol as one of its "inactive ingredients."[3] (*Id.* ¶ 41.)

On August 22, 2022, Logue was informed that he would not be allowed to graduate from the DUI Program the next day as anticipated.[4] (*Id.* ¶ 44.) After being denied reconsideration, Logue began to experience a severe increase in his anxiety and depression and shared this information with the DUI Program team on multiple occasions with no response. (*Id.* ¶ 46.) Ultimately, however, the team referred him to a mental health specialist with the DUI Program who did not offer him any assistance and instead remarked that it was interesting he was only now complaining of mental health issues when he had been doing so well up until that point. (*Id.* ¶ 49)

On the evening of September 21, 2022, a crew of fully armed York County probation officers, including Officer Forry, showed up to Logue's house and forced him to take a breathalyzer test. (*Id.* ¶ 50.) Logue admitted that he had consumed two

---

[3] In support, Logue submitted a note from his pharmacist stating that, due to Logue's uncontrolled hypertension, his recommendation for a sore throat would be a topical remedy such as chloraseptic numbing spray. Logue's probation officer responded that the information was "helpful." (*Id.* ¶¶ 42-43.)

[4] Though somewhat confusing, Logue alleges that the team's decision to postpone his graduation was also due in part to his taking an at-home test for COVID-19, which his probation officer deemed an unacceptable means of testing and consequently sanctioned him to two days of community service. (*Id.* ¶¶ 35-37.)

glasses of wine due to his anxiety and inability to sleep, and, in response, Officer Forry entered the home and directed Logue to pour the rest of the bottle down the sink. (*Id.*) Logue explained he felt like he was "derailing," and Officer Forry advised that, while he could arrest Logue for possession of alcohol, he instead wanted Logue to get professional help and promised to reach out the next day to get a psychological referral in motion. (*Id.* ¶¶ 51-52.)

Notwithstanding this promise, the next day the team instructed Logue to report to court on September 28, 2022, regarding the events of the prior evening. (*Id.* ¶¶ 53-54.) When he appeared for court, there was no judge present. (*Id.* ¶ 60.) Instead, Officer Forry was seated at the bench in the judge's chair and informed Logue that he was in violation of his probation and would be detained in York County Prison. (*Id.* ¶ 60.) Logue asked him to reconsider, stating that he had just attended an agreed upon psychiatric consultation that morning and that he had his first physician appointment scheduled for the following week. Officer Forry replied that he "couldn't care less," and ordered Logue to be taken into custody immediately. (*Id.*)

Over a month later, Logue appeared in court upon a motion to lift his detainer and was advised by his attorney that the county would only agree to his release if he was willing to be removed from the DUI program. (*Id.* ¶ 67.) Feeling he had no choice, and having been without psychological services, Logue agreed. (*Id.* 68.)

After his release, Logue spoke with the director of a York County sobriety-based program who was astonished that he was not offered in-patient treatment as a last resort with the DUI Program prior to being discharged as that was the protocol. (*Id.* ¶ 69.)

A hearing was held regarding Logue's probation violation on December 7, 2022. (*Id.* ¶ 71.) At the hearing, Officer Forry recommended Logue be sentenced to six months incarceration with an additional six months of urine testing. (*Id.* ¶ 71.) The district attorney scoffed at that recommendation and instead suggested three months of incarceration. (*Id.* ¶ 72.) Rejecting any incarceration at all, the presiding judge sentenced Logue to three months of house arrest with continuous SCRAM monitoring. (*Id.* ¶ 72.)

In response to these events and due to York County's purported arbitrary and inconsistent treatment of participants in the DUI Program and its handling of Logue's alleged violations, Logue filed a discrimination complaint with the U.S. Department of Justice's Civil Rights Division on March 7, 2023. (*Id.* ¶ 76.) After being advised that no further action would be taken on his complaint, Logue initiated this suit by filing a complaint on March 27, 2023, and thereafter an amended complaint on July 19, 2023. (Doc. 1.)

In his complaint, Logue brings one count of disability discrimination under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134, as

amended by the ADA amendment Act of 2008 and § 504 of the Rehabilitation Act of 1973. Jurisdiction is proper over the claim under 28 U.S.C. § 1331.

UJS, York CCP, and Forry, have moved to dismiss the complaint for failure to state a claim.[5] (Doc. 33.) The motion has been fully briefed and is ripe for review.

## I. STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). "When reviewing a 12(b)(6) motion, we 'accept as true all well-pled factual allegations in the complaint and all reasonable inferences that can be drawn from them.'" *Estate of Ginzburg by Ermey v. Electrolux Home Prods., Inc.*, 783 F. App'x 159, 162 (3d Cir. 2019) (quoting *Taksir v. Vanguard Grp.*, 903 F.3d 95, 96–97 (3d Cir. 2018)). The facts alleged must be "construed in the light most favorable to the plaintiff." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010) (internal quotations, brackets, and ellipses omitted). But "[t]he court is not required to draw unreasonable inferences" from the facts. 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004).

---

[5] Logue has since withdrawn his claim against UJS (*see* Doc. 43 p. 18) and, therefore, the court will dismiss UJS as a party.

6

The Third Circuit has detailed a three-step process to determine whether a complaint meets the pleading standard. *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2014). First, the court outlines the elements a plaintiff must plead to state a claim for relief. *Id.* at 365. Second, the court must "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth." *Id.* Third, the court "look[s] for well-pled factual allegations, assume[s] their veracity, and then 'determine[s] whether they plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). The last step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## II.  DISCUSSION

In his complaint, Logue asserts that Defendants violated the Americans with Disabilities Act ("ADA") by denying him an equal opportunity to participate in the DUI Program and benefit from its services, programs, or activities; by imposing unnecessary eligibility criteria that tend to screen out people with his disability; and by utilizing criteria that impaired or defeated his accomplishment of its objectives. (Doc. 1 ¶ 83.) Defendants move to dismiss the complaint on the basis that Logue has failed to establish that he was intentionally denied an equal opportunity to participate in the program or benefit from it, and that even if he has, that they are entitled to immunity.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Thus, in order "[t]o successfully state a claim under Title II of the ADA, a person 'must demonstrate: (1) he is a qualified individual; (2) with a disability; (3) [who] was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability.'" *See Haberle v. Troxell*, 885 F.3d 171, 178-79 (3d Cir. 2018) (quoting *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 553 n.32 (3d Cir. 2007)). The elements under the Rehabilitation Act ("RA") are the same, except that a plaintiff must also show that the program in question received federal dollars.[6] *Durham v. Kelly*, 82 F.4th 217, 225 (3d Cir. 2023) (citing 29 U.S.C. § 794 and *Gibbs v. City of Pittsburgh*, 989 F.3d 226, 229 (3d Cir. 2021)). Where, as here, compensatory damages are sought, a plaintiff must also show intentional discrimination under a deliberate indifference standard by alleging "(1) knowledge that a federally protected right is substantially likely to be violated . . . and (2) failure to act despite that knowledge." *Haberle*, 885 F.3d at 178, 181.

---

[6] Because the substance of the claims is the same, the court will analyze them together.

As an initial matter, Defendants do not dispute that Logue is a qualified individual with a disability. The complaint clearly alleges that Logue suffers from alcohol use disorder that substantially limits his ability to participate in one or more major life activities. (Doc. 31 ¶ 8). It further alleges that Logue was admitted to and participated in the DUI program, thus establishing that he was qualified for it.

Instead, Defendants argue that the complaint fails to establish the third element of a prima facie discrimination claim because it does not sufficiently allege that Logue was excluded from the DUI Program or denied its benefits. Rather, as the complaint itself alleges, Logue was, in fact, admitted into the DUI Program and received the benefits of its services and activities for many months. (Doc. 37, pp. 10-11.) He was only later removed due to his alcohol-related infractions. (*Id.*)

Logue plausibly alleges, however, that it was his disability, *i.e.*, his alcohol-use disorder, that resulted in those infractions and that the methods Defendants imposed in enforcing its eligibility criteria for continued participation in the program—including the requirement not to use alcohol—had the effect of illegally discriminating against someone like him with his disability. In addition, he adequately pleads that Defendants arbitrarily applied its eligibility criteria in contravention of its own protocol and policies by denying him access to psychological services and inpatient treatment prior to removing him from the DUI

Program. Construed liberally and drawing all inferences in favor of Logue, the complaint has established a prime facie case of discrimination.[7]

However, the complaint fails to plausibly allege deliberate indifference, *i.e.*, that Defendants intentionally discriminated against Logue. As noted previously, to plead deliberate indifference, Logue must allege that York CCP had "(1) knowledge that a federally protected right is substantially likely to be violated . . . and (2) failure to act despite that knowledge." *Haberle*, 885 F.3d at 178, 181.

While the complaint points to several discrete actions taken by York CCP employees that were allegedly discriminatory, it fails to allege that York CCP "was aware that its existing policies made it substantially likely that disabled individuals would be denied their federal protected rights under the ADA." *Haberle*, 885 F.3d at 181. That is, to show deliberate indifference, the complaint must allege that the defendant's policies caused a failure to "adequately respond to a pattern of past occurrences of injuries like the plaintiff's," or, second, "that the risk of ... cognizable harm was 'so great and so obvious that the risk and the failure ... to respond will alone' support finding" deliberate indifference. *Beers-Capitol v. Whetzel*, 256 F.3d 120, 136-37 (3d Cir. 2001) (quoting *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989). The complaint here fails to make any such allegations.

---

[7] The court notes that Logue has also sufficiently alleged that York CCP receives federal funds, an element for an RA claim.

10

There is nothing in the complaint to suggest that there was any pattern of past occurrences of similar injuries. Instead, the complaint alleges that prior to being removed from the DUI Program, Logue was denied in-patient treatment as a last resort, which was "always the protocol that the York County Drug Court team follows," (Doc. 1, ¶ 69), meaning that this type of alleged violation had not previously occurred. Although the complaint broadly alleges that those responsible for the DUI Program "caused significant harm to individuals under the court's supervision," such sweeping allegations do not plausibly give rise to an entitlement to relief. In addition, the complaint fails to establish that the risk of harm to Logue was "'so great and so obvious' as to obviate the need for [him] to allege fact's pertaining to [York CCP's] knowledge." *Id.* (quoting *Beers-Capitol*, 256 F.3d at 136). As Logue has failed to plausibly allege deliberate indifference, his ADA and RA claims fail.

Finally, even assuming, *arguendo*, that the complaint had adequately plead deliberate indifference, the Pennsylvania Courts of Common Pleas are state entities entitled to sovereign immunity under the Eleventh Amendment. *Dutton v. Court of Common Pleas of Phila. Domestic Rels. Div.*, 215 F. App'x. 161, 162 (3d Cir. 2007) (citing *Benn v. First Judicial Dist. of Pa.*, 426 F.3d 233, 235 n.1, 240-41 (3d Cir. 2005). Thus, the court must inquire whether "Congress unequivocally expressed its intent to abrogate that immunity and whether, in doing so, "Congress acted pursuant

to a valid grant of constitutional authority." *Tennessee v. Lane*, 541 U.S. 509, 517 (2004) (citing *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73 (2000)).

In *Lane*, the Supreme Court held that "Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment." *Lane*, 541 U.S. at 533-34 (explaining that Title II's obligation to "accommodate persons with disabilities in the administration of justice" is "a reasonable, prophylactic measure.") *Lane* concerned a paraplegic criminal defendant who, literally, could not access the second-floor courtroom to answer for charges because the courthouse lacked an elevator, and therefore could not exercise his "right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." *Id.* at 513-14, 523 (citation omitted). This abrogation of the states' sovereign immunity, however, is not unlimited. *United States v. Georgia*, 546 U.S. 151, 159 (2006). In *Georgia*, the Supreme Court explained that the lower courts were best situated, "on a claim-by-claim basis, (1) to determine which aspects of the State's alleged conduct violated Title II (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violated the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Georgia*, 546 U.S. at 159.

12

Defendants point out, and the court agrees, that Logue has not met the test laid out in *Georgia* because, even assuming that he has a viable ADA claim, he has not plausibly plead a Fourteenth Amendment violation. (Doc. 37, pp. 15-17.) The "fundamental right of access to the court" speaks to constitutional rights such as due process. (*Id.*, p. 16.) Here, the complaint does not allege any violation of Logue's due process rights, (*See generally* Doc. 31), and instead avers that Logue both accessed and participated in the court's DUI Program. He was later was only removed after repeated infractions and following a hearing before a judge. Thus, York CCP is entitled to sovereign immunity.

Nonetheless, the court will provide Logue with the opportunity to amend his complaint as to Defendant York CCP only. Generally, the district courts should grant leave to amend "freely . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). That principle is particularly potent in civil rights cases. *Mullin v. Balicki*, 875 F.3d 140, 151 (3d Cir. 2017). But even in civil rights cases, leave to amend need not be granted if "amendment would be futile or inequitable." *Vorchheimer v. Phila. Owners Ass'n*, 903 F.3d 100, 113 (3d Cir. 2018). The deficiencies outlined in this memorandum are factual rather than legal in nature, and a curative amendment of the claims is conceivable against York CCP.

### III. <u>CONCLUSION</u>

For the reasons set forth above, the motion to dismiss will be granted. An appropriate order shall follow.

>/s/ Sylvia H. Rambo
>SYLVIA H. RAMBO
>United States District Judge

Dated: March 21, 2024